JAMES R. HASENYAGER (Bar No. 1404)
PETER W. SUMMERILL (Bar No. 8282)
HASENYAGER & SUMMERILL
Attorneys for Plaintiff
1004 24th Street
Ogden, UT 84401
Telephone:  (801) 621-3662
Facsimile:  (801) 392-2543

|  IN THE UNITED STATES DISTRICT COURT  |
| IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION |

| | |
|---|---|
| GREGORIO VALDIVIA, and, JACQUELINE RIMOLOA, individually and as parents and heirs of ASTRID VALDIVIA, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF UTAH , UTAH DEPARTMENT OF HUMAN SERVICES, and, UTAH YOUTH VILLAGE, and, ANA BROADBENT, and, KIM DAHL-HANSEN MANN, SUNSET MONITORING SERVICES, and, SATELLITE TRACKING OF PEOPLE, LLC, a Houston, TX based company doing business in Utah, <br><br> Defendants. | Case No. 1:13cv00047 <br><br><br> COMPLAINT - FIRST AMENDED <br><br><br> Magistrate Judge: Evelyn Furse <br> Judge: |

COME NOW Plaintiffs by and through counsel, Peter W. Summerill and James R. Hasenyager of Hasenyager & Summerill, and hereby amend the complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B) allege and complain against Defendants as follows:

**Parties and Jurisdiction**

1. Plaintiffs Gregorio Valdivia and Jacqueline Rimola, the parents and heirs of Astrid Valdivia (deceased at the age of 13 years), are and, at all relevant times, have been residents of Weber County, Utah.[1]

2. Astrid Valdivia, deceased, was at all relevant times a minor under the care and supervision of Defendants.

3. At all times relevant hereto Defendant, State of Utah, is the governmental entity charged with administrating the needs of the state, under which are the entities Utah Department of Human Services. The State of Utah is being sued for the action of its agents and employees.

4. At all times relevant hereto and upon information and belief, Defendant Utah Department of Human Services is responsible for licensing placement agencies and proctor homes.

5. At all times relevant hereto and upon information and belief, Defendant Ana Broadbent was an employee and case worker assigned to Astrid's case.

6. At all times relevant hereto, Utah Youth Village, as a contractor for the State, is a placement and/or proctor agency and group home licensed, governed and monitored by the State and was the agency which oversaw the care of Astrid.

---

[1] All allegations contained in this Complaint are 'further incorporated as if fully set forth herein' and are 'at all times relevant to the claims at issue.'

  6.1. Youth Village provides the State with proctor placement of delinquent children, which children require daily supervision, behavioral treatment, and/or other rehabilitative interventions.

7. At all times relevant hereto, on information and belief, Kim Dahl-Hansen Mann, an LCSW and/or Ana Broadbent contractors and/or employee for the State, also oversaw the care of Astrid.

8. At all times relevant hereto, Sunset Monitoring Services, LLC was a Utah State contractor providing 'ankle bracelet' GPS tracking services and provided such ankle bracelet for the benefit of Astrid.

9. At all times relevant hereto, Satellite Tracking of People, LLC was a Texas limited liability company doing business in the State of Utah.

  9.1. Jurisdiction over Satellite Tracking is proper pursuant to Utah Code Ann. § 78B-3-201 *et. seq.* as enacted and the time and subsequently amended.

10. In compliance with Utah Code Ann. § 63G-7-101, *et. seq.*, notice of this action was previously provided to the Defendants and the time for responding to that notice has expired.

11. Pursuant to Utah Code Ann. § 63G-7-601, Plaintiffs posted a $300.00 cash bond at the time of filing this Complaint.

12. Original jurisdiction was placed in the District Courts of Utah.

13. The State Defendants removed this action pursuant to 28 U.S.C. §§ 1441(b), 1443, and 1446 as a result of Plaintiffs' pleading a cause or claim under 42 U.S.C. § 1983.

14. No party has contested removal. However, Plaintiff reserves the right to have the case remanded for any and all remaining pendent claims and parties should federal jurisdiction become inappropriate for any reason.

### Facts

15. Prior to October 6, 2010, Astrid had left the State of Utah pursuant to a kidnapping and abduction of Anthony Martinez.

    15.1. Astrid, a minor child aged 13 years old, was under the influence and direction of the much older Martinez, aged 31.

16. On her return to Utah, on or about October 6, 2010, Astrid's parents voluntarily placed her in the custody of the State.

17. Gregorio and Jacqueline placed Astrid in the State's custody in order to protect her safety, health and welfare and to further prevent her association with and/or departure from the State under the influence of Martinez.

18. The State placed Astrid in the Utah Youth Village group home.

19. Youth Village employees determined that, as part of their behavioral treatment and mental health care for Astrid, she required monitoring to protect her from an unhealthy and inappropriate relationship with Anthony Martinez.

20. Youth Village's treatment plan required clinical intervention to address the issues surrounding depression, appropriate boundaries, appropriate role models, self esteem, expressing feelings appropriately and honest communication. Astrid was involved in an

   unhealthy relationship with Mom's ex-boyfriend which has caused a lot of confusion for her.

21. State and Youth Village employees determined that Astrid needed treatment to address issues related to her relationship with Anthony Martinez, including running away, and she should be placed in a more restrictive setting.

22. The goal of the behavioral and mental health services was to determine degree of risk in order to coordinate, assess, link, and monitor treatment needs of children at risk.

23. Broadbent expressed concerns that Astrid's need to find Martinez would overpower her rational thinking.

24. DCFS workers suggested using an ankle monitor and Ana Broadbent contacted Sunset monitoring to provide that monitor.

25. While in the custody of the State, a court order required Astrid to wear an ankle monitoring bracelet at all times.

26. Utah Youth Village's team assessed Astrid as a high risk.

27. Youth Village employee Ana Broadbent contacted Sunset and requested Sunset's services in providing the ankle monitoring.

28. Sunset agreed to provide ankle monitoring for Astrid.

29. A Preventative Statement by Youth Village identified Astrid as a child wearing ankle monitor to maintain contact and as beginning individual therapy, group therapy and family therapy.

30. Kim Dahl-Hansen Mann and Ana Broadbent provided mental health care to Astrid.

31. Utah Youth Village employees, various house, foster and/or proctor parents also provided care to Astrid.

32. One or several Youth Village employees, house, foster and/or proctor parents (hereafter 'Youth Village Parent') provided transportation from Salt Lake to Ogden.

33. The Youth Village Parent allowed Astrid to go into the home of a family member of Anthony Martinez.

34. Neither the home nor its occupants were verified and were not approved as a safe visitor location for the high risk Astrid.

35. Astrid remained for some time unsupervised in the home.

36. Thereafter, Kim Dahl-Hansen Mann and/or Ana Broadbent or other State of Utah team members, including case workers, discussed Astrid and Stockholm Syndrome.

37. Therapist Kim Dahl-Hansen Mann, Ana Broadbent and/or other State of Utah team members, including caseworkers, recommended and/or agreed Astrid should be told Martinez had been released from jail.

38. Kim Dahl-Hansen Mann and/or Ana Broadbent and/or a caseworker then told Astrid that Martinez had been released from jail.

39. Kim Dahl-Hansen Mann and/or Ana Broadbent then told Astrid that Martinez had been returned to Utah.

40. On January 5, 2011 Astrid obtained a knife from Utah Youth Village and cut the ankle monitor.

41. On January 6, 2011, DCFS recommended to Astrid's parents that she be placed in a treatment home.

42. Astrid was identified as a run risk.

43. Astrid made statements that she wanted to die if she could not be with Martinez.

44. Therapists and social workers believed it was highly likely that Astrid had a sexual relationship with Martinez.

45. On January 11, 2011 Astrid was placed in a Utah Youth Village treatment home.

46. On January 18, 2011 at 10:27 p.m. Astrid again cut and removed her ankle monitor a second time and left the Utah Youth Village treatment home.

47. An investigation provided by State of Utah on November 1, 2011 informed Plaintiff that the on-line monitoring system for Astrid's ankle monitor was down on January 18th, 2011 from 8:00 p.m. until 11:00 p.m. for unscheduled maintenance.

48. Satellite Tracking did not notify anyone that the ankle monitoring GPS system would not be functioning or was not functioning.

49. Sunset Monitoring did not notify anyone that the ankle monitoring GPS system would not be functioning or was not functioning.

50. Sunset Monitoring and/or Satellite Tracking did not notify anyone that Astrid's monitor had been tampered with and removed until January 19, 2011.

51. Utah Youth Village proctor parents were not aware Astrid was missing until January 19, 2011.

52. Astrid left with Martinez and they traveled to the State of Washington.

53. Kitsap County Sheriff's was notified by an acquaintance of Martinez that he was in Kitsap County, armed with a gun, had possession of a minor and believed sexual offenses were taking place against the minor (Astrid).

54. The acquaintance worked with Kitsap Sheriff's Department to arrange a meeting in a Walmart parking lot in Port Orchard, Washington without Martinez' knowledge of law enforcement involvement.

55. Kitsap County Sheriff deputies approached Martinez in the parking lot of the Walmart.

56. Martinez ran from the deputies.

57. As the deputies pursued, Martinez fired his weapon multiple times, wounding two deputies.

58. A third deputy shot Martinez, hitting him in the leg.

59. Astrid ran to Martinez.

60. Martinez then fatally shot Astrid before turning the gun on himself.

61. State of Utah, Youth Village, Broadbent, Mann and Sunset provided the services arising out of behavioral and mental health treatment for Astrid.

62. The services provided included individual counseling, family therapy, behavioral treatment and monitoring to prevent 13 year old Astrid from reuniting with the 31 year old Martinez.

63. On September 12, 2012, Plaintiffs', Astrid's parents, filed a Notice of Intent and Request for Prelitigation to commence a lawsuit as required by the Utah Malpractice Act naming

State of Utah, Youth Village, Broadbent, Mann and Sunset for the services they provided arising out Astrid's mental and behavioral health treatment.

64. The Utah State Department of Professional Licensing accepted the Notice of Intent and Request for Prelitigation and expressly stated that "[t]he Request tolls the applicable statute of limitations until 60 days after the Division issues the opinion of the pre-litigation panel."

65. No decision has been issued yet by the prelitigation panel.

## First Claim For Relief
## Negligent Placement, Supervision, and Licensing

66. Astrid was in a protected class when she was placed in the custody of the State and when the court ordered fixation of an ankle bracelet monitor.

67. Defendants were responsible for licensing, overseeing and supervising Utah Youth Village and their employees to ensure compliance with all state regulations and law for the safety and security of children placed in the hands of Utah Youth Village.

68. Defendants knew or should have known that Astrid was in an unsafe, unsecured and questionable environment based upon, *inter alia*, the foster parent and/or employee unauthorized transportation of Astrid to Ogden.

69. Defendants owed a duty and obligation to place Astrid in a secure environment worthy and capable of overseeing the life and health of children trusted to their care.

70. Defendants had a duty to establish minimum standards for the operation of all private residential facilities.

71. Defendants had a duty to evaluate and assess each proctor/foster parent/employees home where delinquent children were placed to ensure the placement met minimum standards.

72. Defendants had a duty to follow up and inspect on a regular basis to see that it continually met minimum standards, complied with court orders and all laws and regulations.

73. Defendants had a duty to ensure that each placement was suitable for each individual child.

74. Defendants were charged with the care of delinquent children, known to be a flight risk, and owed a duty to regularly and appropriately monitor their wards.

75. Defendants had a duty to prevent their wards from fleeing, including ensuring that all protective measures put in place remained in place.

76. Defendants breached their duties and failed to meet those minimum standards including applicable state laws, regulations and departmental policies and procedures.

77. Defendants, their agents or employees negligently and carelessly:

   77.1. failed to prevent Astrid from running away with Anthony Martinez;

   77.2. took her on an unauthorized visit to Anthony Martinez' sister's home where an escape was planned or facilitated;

   77.3. failed to protect her;

   77.4. failed to timely discover that Astrid had cut off an ankle monitor; and,

   77.5. failed to timely report Astrid missing from the Utah Youth Village treatment facility.

78. Defendants actions and omissions enabled Astrid's flight from Utah in the company of Anthony Martinez, directly and proximately causing the death of Astrid during a shoot out with sheriff's deputies.

79. The parents of Astrid have been damaged by the death and loss of their daughter, her love, care, society and companionship.

## Second Claim for Relief
## 42 U.S.C. § 1983, State Constitutional Rights

80. Plaintiffs held a clearly established and fundamental right and liberty interest; and a right of familial association under the Due Process Clause of the Fourteenth Amendment to receive care and security while a ward of the State defendants.

81. Astrid held a clearly established and fundamental right and liberty interest, *inter alia*, under the Utah Constitution, article I, section 1; article I, section 7; article I, section 25; article I, section 26; and, article I section 27.

82. Because of Defendants' knowledge regarding Astrid's devotion, compulsion and propensity to reunite with Martinez, the State defendants stood in a special relationship with Astrid.

83. Defendants owed affirmative duties to ensure that, at the very least, they carefully and physically monitored Astrid for the benefit of her own safety as her parents had turned her custody and care over to the State for the very purpose of protecting her and keeping her safe.

84. Defendants failed to properly place Astrid in an environment where she would have been so protected.

85. Defendants further failed to properly monitor Astrid once placed.

86. Defendants decision to inform Astrid of Martinez release from jail and return to Utah represented a reckless disregard and deliberate indifference to her medical needs in light of her prior statements that she wanted to die if she could not be with Martinez.

87. Defendants' conduct as set forth herein deliberately disregarded the rights of Astrid, her parents and heirs in a manner that is conscience shocking and egregious.

88. Defendants' conduct is a flagrant violation of Astrid's, her parent's and heir's constitutional rights for which existing remedies do not redress injuries; and equitable relief was and is wholly inadequate to protect plaintiff's rights or redress injuries.

89. The violations of the constitutional rights directly and proximately led to the death of Astrid Valdivia.

### Third Claim for Relief
### Negligence

90. Defendants' decision to inform Astrid of Martinez's release from jail and return to Utah represents a breach of the standard of care owed in light of Astrid's mental state toward and unhealthy relationship with Martinez.

91. Defendants failure to more carefully monitor and secure Astrid in light of her mental state also represents a breach of the standard of care.

92. The monitoring service was provided as part of treating Astrid's behavioral and mental health conditions including, but not limited to, Stockholm Syndrome and a strong desire to reunite with Martinez.

93. Defendants knew or should have known that the ankle monitor was subject to manipulation and removal.

94. Defendants failed to take any additional steps or measures to ensure the safety of Astrid through monitoring her whereabouts and preventing a reunion with Martinez.

95. As a direct and proximate result of Defendants failure to properly monitor and treat, Astrid was able to leave her State supervised environment, reunite with Martinez and be fatally shot.

96. Defendants Sunset Monitoring and Satellite Tracking knew or should have known that there would be a 'down' period for the ankle monitor tracking services.

97. Sunset Monitoring and/or Satellite Tracking failed to inform, warn or otherwise make co-Defendants aware of the downtime.

98. In the alternative, Sunset Monitoring and/or Satellite Tracking failed to properly maintain the ankle monitor tracking services and system.

99. In the alternative, Sunset Monitoring and/or Satellite Tracking failed to timely inform the co-Defendants that the ankle monitor had been removed and was no longer tracking Astrid.

100. As a direct and proximate result of Sunset Monitoring and/or Satellite Tracking's failure to warn, inform of a down time, their failure to properly maintain the system, and/or

failure to timely inform co-Defendants that the ankle monitor had been removed, Decedent Astrid was able to leave her supervised environment, reunite with Martinez and be fatally shot.

As a result of Defendants' negligence and/or reckless disregard of the rights of Astrid and the Plaintiffs, Plaintiffs and the other heirs of Astrid Valdivia have lost the love, society and companionship of their daughter and sibling in amounts to be proved at trial.

Wherefore, Plaintiff requests judgment against Defendant for such damages including punitive damages as are proved at trial, for costs in accordance with Section 78B-2-111 U.C.A., and for such other and further relief as may be just and proper.

DATED this: April 23, 2013

/s/ Peter W. Summerill

CERTIFICATE OF SERVICE

I hereby certify that on this April 23, 2013 I the federal court's electoronic filing system a true and correct copy of the above and foregoing First Amended Complaint, to:

| Shawn McGarry, Nan T. Bassett, Andrew R. Hale<br>KIPP & CHRISTIAN<br>10 EXCHANGE PLACE FOURTH FL<br>SALT LAKE CITY, UT 84111-2314<br>(801)521-3773<br>nbassett@kippandchristian.com,<br>smcgarry@kippandchristian.com,<br>ahale@kippandchristian.com<br>Representing Utah Youth Village & Kim Dahl Hansen Man | Phillip S. Ferguson, Kristen Kiburtz<br>CHRISTENSEN & JENSEN PC<br>15 W SOUTH TEMPLE STE 800<br>SALT LAKE CITY, UT 84101<br>(801)323-5000<br>phillip.ferguson@chrisjen.com,<br>kristen.kiburtz@chrisjen.com<br>Representing Satellite Tracking |
|---|---|

| | |
|---|---|
| Ford G. Scalley, Dustin D. Gibb<br>SCALLEY READING BATES HANSEN & RASMUSSEN<br>15 W SO TEMPLE STE 600<br>PO BOX 11429<br>SALT LAKE CITY, UT 84147-0429<br>(801)531-7870<br>dgibb@scalleyreading.net,<br>bud@scalleyreading.net<br>Representing Sunset Monitoring Services | Joni J. Jones, Reed Stringham, III, Kyle J. Kaiser<br>UTAH ATTORNEY GENERAL'S OFFICE<br>(160-6-140856)<br>LITIGATION UNIT<br>160 E 300 S 6TH FL<br>PO BOX 140856<br>SALT LAKE CITY, UT 84114-0856<br>(801)366-0100<br>jonijones@utah.gov, rstringham@utah.gov, kkaiser@utah.gov<br>Representing State of Utah, Department Human Services, Ana Broadbent |

DATED this: April 23, 2013

/s/ Peter W. Summerill